LDV/2008R00496

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | |
| | : | Criminal No. 10- 485 (WJM) |
| RONALD OTTAVIANO, | : | |
| MICHAEL BALICE, | : | |
| PAULA MARIANI, | : | 18 U.S.C. §§ 371, 982, |
| PATRICK POTOPOWICZ, | : | 1957, and § 2 |
| HARRIET FOSTER, | : | |
| RICHARD MACFARLANE, | : | |
| WILSON CALLE, and | : | |
| ANGEL DONE | : | |

**I N D I C T M E N T**

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

**COUNT 1**
**(Conspiracy to Defraud the United States – All Defendants)**

At all times relevant to this Indictment:

1.      Mid-Atlantic Trustees and Administrators ("MATA") was a business

established at least as early as in or about 2005.  MATA was based first in Toms River, New

Jersey, and later, in Bayville, New Jersey, with a satellite office in Keasbey, New Jersey.  As of

in or about May 2010, MATA was based in Rehoboth Beach, Delaware.  At no time did MATA

conduct legitimate business.  Instead, MATA developed, marketed, and sold products that were

designed to assist customers with, among other things: hiding income and assets from the

Internal Revenue Service ("IRS"); and fraudulently attempting to discharge debt, including

mortgage debt, credit card debt, and tax obligations.  Through at least in or about April 2008,

MATA was run by its two principals, defendants RONALD OTTAVIANO and MICHAEL

BALICE, but included a number of additional employees who served as a sales force for MATA. That sales force, using the Internet, and in-person and telephonic seminars, and directed by defendants OTTAVIANO and BALICE, was successful in attracting hundreds of customers to MATA and netting for MATA over $4.5 million in illicit gross receipts.

        2.     MATA developed, marketed, and sold two principal products, the Pure Trust Organization ("PTO") and Beneficiaries in Common ("BIC"). Although MATA marketed PTOs as legally valid trusts, they were actually sham trusts. MATA established hundreds of PTOs for their customers, the express design of which was to remove customers' income and assets from the customers' names and place them instead into the names of defendants OTTAVIANO and BALICE as trustees, all the while allowing the customers to maintain continued and uninterrupted access to their income and assets. According to MATA, because the customers' income and assets were not in the customers' names, they were inaccessible to the customers' creditors and, significantly, not taxable by the IRS. MATA promoted PTOs as legally valid trusts even though MATA, its principals, and its employees knew that PTOs were sham trusts and illegal.

        3.     MATA marketed and sold the second product, BIC, as a debt elimination program. According to MATA, when the United States went off of the gold standard in 1933, the country went bankrupt, and the citizenry became debtors. But by filing certain documents with the federal and state governments, including fictitious bonds and promissory notes, a citizen could be converted from debtor to creditor, with the associated benefit of having the United States Treasury become responsible for the newly minted citizen-creditor's "public" debt. MATA won hundreds of BIC customers who collectively paid MATA millions of dollars to

become "bonded" through the BIC program.  The BIC process worked as follows: MATA

manufactured and sent false and fraudulent bonds for its customers to the United States Secretary

of the Treasury, often with face values of tens of millions of dollars or more.  According to

MATA, once those bonds were sent and a certain amount of time had passed, customers were

bonded, and could then draw down upon their bonds to discharge all forms of public debt,

including, for example, mortgage debt, credit card debt, and tax obligations.  MATA then

manufactured and sent false and fraudulent Promissory Notes, the paper purportedly used to

discharge public debt, to mortgage companies, credit card companies, and the Treasury

Department to eliminate customers' debts.  MATA promoted BIC as a successful method of debt

elimination even though MATA, its principals, and its employees knew that BIC had never

successfully eliminated any customer's debt.

       4.     Defendant OTTAVIANO lived in Tuckerton, New Jersey and Lewes,

Delaware.  He was a founder and operator of MATA, and served as its President and Chief

Executive Officer.  From time to time, he falsely held himself out to be an attorney.  Defendant

OTTAVIANO was married to defendant HARRIET FOSTER.  Defendant OTTAVIANO has not

filed a federal tax return since 1991.  Between 2007 and 2008, defendant OTTAVIANO

personally profited from the MATA scheme by at least approximately $822,258.  Defendant

OTTAVIANO funneled this income through various PTOs, including, Diversified Funding,

Shore Trust, Asset Management Trust, and Diversified Holding, all of which were controlled by

him and defendant FOSTER.

       5.     Defendant BALICE lived in Metuchen, New Jersey.  Defendant BALICE

was a co-founder of MATA.  Through at least in or about April 2008, defendant BALICE served

as the Secretary and Chief Financial Officer of MATA. Defendant BALICE has not filed a federal tax return since 1998. Between 2007 and 2008, defendant BALICE personally profited from the MATA scheme by at least approximately $183,577. Defendant BALICE's income from the scheme was deposited, at least in part, into Maple Avenue Funding, a PTO controlled by him.

6.     Defendant PAULA MARIANI lived in Princeton, New Jersey. Defendant MARIANI was an employee of MATA from at least as early as in or about May 2007. Among other things, defendant MARIANI recruited customers for MATA, hosted seminars that promoted both the PTO and BIC programs, and assisted MATA with the BIC process and filings related to it, including the preparation of fraudulent federal income tax returns for MATA customers. She was married to defendant PATRICK POTOPOWICZ, who was also an employee of MATA.

7.     Defendant POTOPOWICZ was an employee of MATA who, among other things, recruited customers for MATA, hosted seminars that promoted both the PTO and BIC programs, and assisted in the preparation of fraudulent federal income tax returns for MATA customers as part of the BIC process. Between 2007 and 2008, defendants MARIANI and POTOPOWICZ profited from the MATA scheme by at least approximately $50,033, all of which was deposited into Clearwater Trust, a PTO controlled by them.

8.     Defendant FOSTER was the wife of defendant OTTAVIANO, and served as the office manager of MATA beginning in or about February 2008. Among other things, defendant FOSTER interfaced with MATA customers by answering their questions about the PTO and BIC programs, and facilitated the creation of PTO and BIC paperwork, including Indemnity Bonds, Offset Bonds, Promissory Notes, and UCC Contract Trust Agreements. She

-4-

also assisted in mailing BIC documents to the Treasury Department and other governmental agencies.

       9.     Defendant RICHARD MACFARLANE lived in Doylestown, Pennsylvania.  Defendant MACFARLANE was an employee of MATA from at least as early as in or about October 2007.  Among other things, defendant MACFARLANE recruited customers for MATA, hosted seminars that promoted the PTO and BIC programs, and assisted MATA with the BIC process and filings related to it.  Between 2007 and 2008, defendant MACFARLANE profited from the MATA scheme by at least approximately $23,250, all of which was deposited into Courage Trust, a PTO controlled by him.

       10.    Defendant WILSON CALLE lived in Queens, New York.  Defendant CALLE was an employee of MATA who, among other things, recruited customers for MATA, hosted seminars that promoted the PTO and BIC programs, and assisted with the BIC process and filings related to it, including the preparation of fraudulent federal income tax returns for MATA customers.

       11.    Defendant ANGEL DONE lived in Queens, New York.  Defendant DONE was an employee of MATA who, among other things, recruited customers for MATA, hosted seminars that promoted the PTO and BIC programs, and assisted with the BIC process and filings related to it, including the preparation of fraudulent federal income tax returns for MATA customers.  Between 2007 and 2008, defendants CALLE and DONE profited from the MATA scheme by at least approximately $50,545, all of which was paid into Manamin International Funding, Agape Holding Trust, and Andosa Funding, PTOs jointly controlled by them.

       12.    Unindicted co-conspirator one ("UC 1") worked as a personal

banker at various Bank of America branches in New Jersey from in or about December 2006

through in or about January 2008.  UC 1 was responsible for opening approximately 300 Bank of

America checking accounts associated with MATA PTOs.

13.    The IRS is an agency of the United States Department of the Treasury

(hereinafter, "the U.S. Treasury"), which is headquartered in Washington, D.C.  The IRS has

responsibility for the ascertainment, computation, assessment, and collection of taxes, including

income taxes.

14.    From at least as early as in or about 2005 through in or about July 2010, in

the District of New Jersey and elsewhere, defendants

RONALD OTTAVIANO,
MICHAEL BALICE,
PAULA MARIANI,
PATRICK POTOPOWICZ,
HARRIET FOSTER,
RICHARD MACFARLANE,
WILSON CALLE, and
ANGEL DONE

did unlawfully, voluntarily, intentionally and knowingly combine, conspire, confederate, and

agree with each other and with individuals both known and unknown to the grand jury, to

defraud the United States by impeding, impairing, obstructing, and defeating the lawful

government functions of the IRS to ascertain, compute, assess, and collect income and other

taxes for themselves and others.

### Object of the Conspiracy

15.    It was the object of the conspiracy that defendants OTTAVIANO,

BALICE, MARIANI, POTOPOWICZ, FOSTER, MACFARLANE, CALLE, and DONE, and

others would impede and impair the function of the IRS to ascertain, compute, assess, and collect income and other taxes by creating, marketing, and selling programs to hundreds of customers across the country that, in the case of PTOs, were designed to aid customers in improperly shielding income and other assets from the IRS and, in the case of BIC, designed to falsely and fraudulently discharge customers' debts, including outstanding tax obligations.

**Manner and Means of the Conspiracy**

16.     Defendants OTTAVIANO and BALICE formed MATA in or before 2005 and through MATA, sold two principal products, PTOs and BIC.  At some time in 2007, defendants OTTAVIANO and BALICE began to employ a sales force who, in exchange for referral fees and commissions, marketed PTOs and BIC to prospective customers.  That sales force included, among others, defendants MARIANI, POTOPOWICZ, MACFARLANE, CALLE, and DONE.

17.     The defendants marketed and sold PTOs as legally valid trusts that removed customers' assets from their names, while still allowing the customers access to and control over their assets.  In this way, according to the defendants, customers could control their assets without having to pay taxes on them.  In total, from the formation of MATA through in or about July 2010, the defendants established several hundred PTOs for their customers.  The defendants express aim in doing so was to falsely and fraudulently conceal income and assets and aid their customers in concealing income and assets from the IRS.

18.     The defendants marketed BIC as a debt elimination program that could be used to discharge all forms of public debt, including mortgage debt, credit card debt, and tax obligations.  As part of the BIC process, the defendants sent hundreds of bonds, Promissory

-7-

Notes, and related paperwork to the U.S. Treasury, the IRS, and other government agencies to purportedly discharge their customers' public debts. The defendants' claims notwithstanding, those bonds and Promissory Notes were false and fraudulent, discharged no debts, and were only successful in flooding the U.S. Treasury, the IRS, and other government agencies with hundreds of billions of dollars in worthless paper.

**A. The PTO Program**

19.     The defendants specifically marketed the PTO program as providing "asset protection" from "spendthrifts, lawsuits, taxes, probate and estate taxes."

20.     The defendants charged their customers fees for establishing PTOs. As of on or about December 26, 2007, a single PTO cost approximately $3,000, two cost $5,600, and three PTOs cost $7,800. The defendants also charged a PTO management fee of approximately $150 per quarter per PTO.

21.     When a customer purchased a PTO through MATA, a checking account was opened at Bank of America in the name of the PTO, with defendants OTTAVIANO and BALICE listed as trustees, and the customer as the "Exchanger." It was into this checking account that the customer's monetary assets were placed. Generally, the customer's name was not associated with the PTO or the Bank of America checking account.

22.     The defendants opened PTO accounts with Bank of America almost exclusively because a MATA customer, UC 1, worked there as a personal banker. UC 1 opened approximately 300 PTO accounts for the defendants. In exchange for doing so, the defendants provided UC 1 with a PTO at no cost.

23.     When opening a new PTO checking account, the defendants sent certain

paperwork to UC 1, including a document titled, "Abstract of Trust," which UC 1 used to open

the PTO checking account.  The "Abstract of Trust" included a "Trust ID number" provided by

the defendants.  Of the approximately 300 PTO checking accounts opened by MATA with

Bank of America, only eight had Trust Identification Numbers validly issued by the IRS.  The

remaining numbers were false and fraudulent.

   24. In creating, marketing, and selling PTOs, the defendants made concerted

efforts to make it appear that PTO customers had "no control" over the assets in the PTO account

and that the trustees had "complete control."  Such efforts were a fiction, however, meant to

conceal that the customers always maintained unfettered access to and control over their assets.

For example:

   A. Monthly Bank of America account statements for the PTO

accounts were mailed to defendant OTTAVIANO at his home in Tuckerton, New Jersey.

Defendant OTTAVIANO, in turn, brought the statements to the MATA office, directed an

employee to match the PTO names with the MATA customer list, and ultimately caused the

statements to be mailed to the appropriate PTO customers.

   B. Each PTO customer was provided with a binder of official-looking

documents and agreements related to his PTO.  At the back of the binder, preceded by a page that

read, in bold red lettering, "KEEP THIS MANUAL PRIVATE," were instructions that provided

the customer with practical advice on operating his PTO.  Those instructions directly

contradicted other documents in the binder, and made explicit that although the customer could

expend funds in any way the customer chose, all expenditures should at least "appear to be the

decisions of the Trustees."

C.      Each PTO customer was provided with a debit card in the name of the PTO, a checkbook in the name of the PTO, and signature stamps bearing the signatures of defendants OTTAVIANO and BALICE, which enabled the customer to use the assets in his PTO as he chose and without interference from defendants OTTAVIANO and BALICE.

25.      Much like their customers, the defendants controlled PTO accounts of their own into which they deposited, among other things, the illicit profits generated from the MATA scheme. The defendants used those PTO accounts to shield their assets from creditors and the IRS.

**B. The BIC Program**

26.      The defendants marketed the BIC program as a debt elimination program. As with PTOs, the defendants developed a fee schedule for BIC. As of on or about December 26, 2007, a single BIC cost approximately $4,000 and came with two Promissory Notes, while a joint BIC (for a married couple) cost approximately $6,000 and also came with two Promissory Notes. The defendants offered a package BIC/PTO for approximately $5,500.

27.      The purchase price bought each BIC customer an Indemnity Bond, Offset Bond, and Promissory Notes that together, according to the defendants, worked to discharge the customer's debts. Specifically, the BIC program worked as follows:

A.      The defendants first created an Indemnity Bond, generally in the amount of $300 million, and mailed it, along with detailed instructions, to the customer. The Indemnity Bond itself was printed on high grade paper, in color, framed by a border, and was otherwise crafted to appear legitimate. The accompanying instructions too were designed to imbue the Indemnity Bond with legitimacy. For example, the instructions warned, "The color of

-10-

ink used on your document is very specific. You must have a red ink pen and a red ink stamp pad to complete your document." They continued, "Do not copy any of the documents. To copy any of the documents after a signature appears on it could be considered to be creating counterfeit currency." After the Indemnity Bond was signed, the customer was directed to send it to the U.S. Treasury and "[a]wait further documents" from the defendants.

    B.  After the customer mailed the Indemnity Bond to the U.S. Treasury, the defendants created an Offset Bond, generally in the amount of $50 million, and mailed it, along with detailed instructions, to the customer. The Offset Bond, like the Indemnity Bond, was printed on high grade paper, in color, framed by a border, and was otherwise crafted to appear legitimate. It too came with detailed instructions designed to imbue it with legitimacy, including the admonition, "***Do not*** copy any of the documents. To do so could be considered the counterfeiting of legal currency." After the Offset Bond was signed, the customer was directed to send it to the U.S. Treasury and "[a]wait further instructions from [MATA]."

    C.  After the customer mailed the Offset Bond to the U.S. Treasury, the customer was purportedly "bonded" and thereby in a position to use Promissory Notes to discharge public debt. The customer was instructed to mail "presentments" to the defendants, which included, among other things, tax obligations, mortgage statements, and credit card bills. The defendants, in turn, created Promissory Notes for the customer designed to discharge the presentment. Like the Indemnity Bonds and Offset Bonds, the Promissory Notes were printed on high grade paper, in color, framed by a border, and were otherwise crafted to appear legitimate. The Promissory Notes were either mailed directly to the debt holder (for example, the mortgage company or credit card company) or to the U.S. Treasury to be mailed to the debt holder.

28.     When the Indemnity Bond, Offset Bond, and Promissory Notes failed to discharge customers' debts, including, tax obligations, the defendants added additional layers to the BIC process, including, the filing of UCC Contract Trust Agreements, as well as IRS documents titled, "Form 56," "Appointment of Fiduciary," "Power of Attorney," and "W-8BEN."

29.     Later, the defendants added a further additional step to the BIC program, the preparation and filing of false and fraudulent tax returns.  The defendants instructed their customers to file false IRS Forms 1099-OID claiming as income the debts they were attempting to discharge through the BIC program.  The defendants further directed their customers to complete their tax returns in a way that made it appear that they were entitled to refunds from the IRS in the amounts of their outstanding debts.

30.     As well, at least some of the defendants themselves utilized IRS Forms 1099-OID with respect to their own federal tax returns in an attempt to obtain false and fraudulent refunds from the IRS.

## Overt Acts

31.     In furtherance of the conspiracy and to effect its unlawful object, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

## A. The PTO Program

32.     On or about October 13, 2006, defendants OTTAVIANO and BALICE caused to be sent via facsimile to UC 1 an "Abstract of Trust" with a fictitious Trust Identification Number.  Upon receipt of that Abstract, UC 1 opened a PTO checking account in the name of Manamin International Funding, which named defendants OTTAVIANO and

-12-

BALICE as trustees and defendant CALLE as "Exchanger."

33.     On or about June 18, 2007, defendants OTTAVIANO and BALICE caused to be sent via facsimile to UC 1 an "Abstract of Trust" with a fictitious Trust Identification Number.  Upon receipt of that Abstract, UC 1 opened a PTO checking account in the name of Clearwater Funding, which named defendants OTTAVIANO and BALICE as trustees and defendants MARIANI and POTOPOWICZ as "Exchangers."

34.     On or about August 11, 2007, defendant OTTAVIANO sent an e-mail with the subject "TRUST SCAM ANSWERS" that included a Microsoft Word document titled, "PTO ANSWERS ABUSIVE TEST."  In that document, defendant OTTAVIANO falsely wrote, "[O]ur PTO[]s all have [Employer Identification Numbers] given by the IRS.  If the PTO was not a lawful business entity[,] [the IRS] would not assign it a number."

35.     On or about August 21, 2007, defendants OTTAVIANO and BALICE caused to be mailed to a PTO customer a letter with attachments indicating that a PTO checking account in the name of Nova Holding had been opened at Bank of America, and identifying defendant DONE as the "Consultant."

36.     In or about October 2007, the defendants made the following false claims in a brochure under the heading, "Advantages of a Mid-Atlantic Pure Trust[:]" (A) "21 years in business"; (B) "[p]ioneered the Pure Trust to average America[ns]"; (C) "[o]ver 5,000 Pure Trusts in [f]orce"; (D) "[s]taff of [a]ttorneys, [Certified Public Accountants], [Certified Financial Planners], and Forensic Accountants"; (E) "[k]nowledgeable professionals in tax law"; (F) "[d]ocuments have been approved by top [t]ax [a]ttorneys"; and (G) "[l]icensed to practice before [the] IRS."

-13-

37.     On or about October 8, 2007, defendants OTTAVIANO and BALICE caused to be mailed a letter to defendant MACFARLANE indicating that a PTO checking account in the name of Courage Trust Co. had been opened for him at Bank of America.

38.     On or about March 28, 2008, defendant OTTAVIANO sent an e-mail to defendant FOSTER that attached a document explaining the "Proper Operation of the 'Pure' Contract Trust (PTO)."

39.     On or about April 18, 2008, defendant OTTAVIANO sent an e-mail to defendant FOSTER that attached various documents concerning the PTO program.

40.     On or about May 4, 2009, defendant FOSTER sent an e-mail to a MATA customer falsely stating, "None of our trusts have ever been investigated.  The trust documents we create are the tightest documents around."

41.     In or about May 2010, the defendants continued to maintain on the MATA website a false and fraudulent customer testimonial that praised MATA and lauded the success of PTOs in hiding assets from the Government so that medical bills would be paid by Medicaid rather than the customer or the customer's family.

**B. The BIC Program**

42.     On or about May 17, 2007, defendant MARIANI sent an e-mail to defendant OTTAVIANO stating, "This is the link for the Maine UCC1 site we discussed last night."

43.     On or about August 29, 2007, defendant OTTAVIANO wrote an e-mail to a MATA customer that gave a false explanation of the theory behind the BIC program.

44.     On or about September 4, 2007, defendant OTTAVIANO sent an e-mail to

-14-

an unindicted co-conspirator falsely claiming that "The [T]reasury officer did say we were doing everything statutorily PERFECT!"

45.     Throughout 2007 and 2008, defendants MARIANI and POTOPOWICZ attempted to recruit and did recruit customers for MATA in exchange for referral fees and commissions.

46.     On or about January 28, 2008, defendant MARIANI sent an invoice in the amount of approximately $3,100 to MATA for work done by her for defendants CALLE and DONE.

47.     Throughout 2007 and 2008, defendant MACFARLANE attempted to recruit and did recruit customers for MATA in exchange for referral fees and commissions.

48.     On or about February 12, 2008, defendant MACFARLANE hosted a telephone conference call with MATA customers to discuss the BIC program.

49.     On or about March 17, 2008, defendant MACFARLANE referred a customer to MATA who completed a customer profile for both the PTO program and the BIC program.

50.     Throughout 2007 and 2008, defendants CALLE and DONE attempted to recruit and did recruit customers for MATA in exchange for referral fees and commissions.

51.     On or about March 7, 2008, defendants CALLE and DONE referred a customer to MATA for the BIC program.

52.     On or about March 18, 2008, defendants CALLE and DONE referred a customer to MATA for the BIC program.

53.     On or about April 5, 2008, defendant OTTAVIANO wrote an e-mail to a

MATA customer falsely claiming a success rate of 100% in stopping foreclosures.

54.     On or about May 21, 2008, defendant OTTAVIANO sent an e-mail with the subject, "PAID MORTGAGES," to a prospective MATA customer.  That e-mail included several attachments purportedly detailing BIC success stories.

55.     On or about May 30, 2008, during a conference call with prospective BIC customers, defendant OTTAVIANO falsely claimed that he had spoken with a compliance officer at the U.S. Treasury who said that the Government traded MATA's BIC bonds on the international market.  On that same call, in response to a prospective customer's question as to whether Promissory Notes were income, defendant OTTAVIANO responded, "No . . . . When the Treasury gets the Promissory Note, the Treasury liquidates [the] Note, sends it to [the] IRS, [and] IRS-[Criminal Investigations Division] believe it or not, are the people that make the payment to the Federal Reserve."

56.     On or about June 2, 2008, defendant MACFARLANE sent an e-mail to an office worker at MATA stating, "These are the UCC-1[]s filed by [unindicted co-conspirator's name redacted] for my clients. [Y]ou could just forward these to the Bishop[,] as they are for him to do the UCC Contract trusts."

57.     On or about June 25, 2008, defendant OTTAVIANO sent an e-mail to defendant FOSTER that attached a form Promissory Note.

58.     On or about July 11, 2008, defendant MARIANI sent an e-mail to defendant FOSTER concerning certain documents needed by defendant MARIANI to complete the BIC program for several MATA customers.

59.     On or about July 14, 2008, defendant MARIANI sent an e-mail to

defendant FOSTER concerning work to be completed by defendant MARIANI for MATA customers.

60.     On or about July 28, 2008, defendant MARIANI sent an e-mail to an office worker at MATA stating, "Yes, as far as what Ron said, I will be helping with [the Indemnity and Offset Bonds]. [H]owever, DO NOT give my name out to any clients.  I do not want my name out there to [MATA] clients[.] [A]s far as they are concerned, I do not exist."

61.     On or about July 30, 2008, defendant OTTAVIANO sent an e-mail to defendant FOSTER, attaching a letter from defendant OTTAVIANO to Citi Cards.  In that letter, defendant OTTAVIANO falsely wrote that the BIC process worked, that there was nothing fraudulent about it, and that the U.S. Treasury knew what MATA was doing.

62.     On or about August 1, 2008, defendant MARIANI sent an e-mail to defendant OTTAVIANO that attached an invoice in the amount of approximately $5,000 for work performed by defendant MARIANI.

63.     On or about August 8, 2008, defendant OTTAVIANO sent an e-mail to defendant FOSTER that attached a document titled, "Promissory Note Mailing," and included the statement, "THINK POSITIVE! THINK OF THE DEBT YOU WILL BE RID OF!"

64.     On or about August 14, 2008, in response to a MATA's customer's request for information, defendant OTTAVIANO responded in an e-mail, "Send in the presentments again for IRS[;] we will tak[e] care of it and get it paid off this time.  We have a new process that works better.  With this process[,] the [n]otary has to do th[e] mailing."

65.     On or about September 19, 2008, in response to a MATA customer's question, defendant OTTAVIANO wrote in an e-mail, "Nothing was done wrong[.] [S]ome notes

paid recently took 8 or 9 months[;] they have been slowing down[,] but are getting paid."

66.   On or about December 20, 2008, defendant OTTAVIANO wrote to a MATA customer in an e-mail, "We still know and believe that we will get everyone paid through this system . . . .  We have made some mistakes in the process along the way[,] and they have been corrected.  Also[,] we have found new criteria that we didn't know in the beginning and are implementing it."

67.   On or about July 20, 2009, defendant OTTAVIANO wrote to two MATA customers in an e-mail, "I am very pleased and [excited] to inform you that we now have a new process to get all debts paid.  ALL DEBTS!  This new process [I] believe or we believe will absolutely work."

68.   On or about July 25, 2009, defendant OTTAVIANO wrote to a MATA customer in an e-mail, "We are now in possession of the process with the bonding system that will pay the debts. [W]e are very [excited] about it[,] and are now in the process of doing this for clients.  We have ironed out all [of] the bugs and with the help of some people in government, we now know what we were doing wrong."

69.   In or about May 2010, the defendants advertised on MATA's website, www.yourpto.com, a price of $3,000 for the PTO program and $4,500 for BIC.  The website also announced a new opportunity for PTO customers to establish corporate bank accounts in Panama.

**C. Tax Returns**

70.   On or about April 15, 2008, defendant OTTAVIANO failed to file an individual income tax return, Form 1040, for calendar year 2007 despite receiving gross income

from the MATA scheme of approximately $558,791. Defendant OTTAVIANO deposited his income into PTO checking accounts controlled by defendant FOSTER and himself, but not held in their names, including Mid-Atlantic Trustees and Administrators, Diversified Funding, Shore Trust, Asset Management Trust, and Diversified Holding.

71.     On or about April 15, 2009, defendant OTTAVIANO failed to file an individual income tax return, Form 1040, for calendar year 2008 despite receiving gross income from the MATA scheme of approximately $263,466. Defendant OTTAVIANO deposited his income into PTO checking accounts controlled by defendant FOSTER and himself, but not held in their names, including Mid-Atlantic Trustees and Administrators, Diversified Funding, Shore Trust, Asset Management Trust, and Diversified Holding.

72.     On or about April 15, 2008, defendant BALICE failed to file an individual income tax return, Form 1040, for calendar year 2007 despite receiving gross income from the MATA scheme of approximately $144,650. Defendant BALICE directed his income, at least in part, into Maple Avenue Funding, a PTO checking account controlled by him, but not held in his name.

73.     On or about April 15, 2009, defendant BALICE failed to file an individual income tax return, Form 1040, for calendar year 2008 despite receiving gross income from the MATA scheme of approximately $38,927. Defendant BALICE directed his income, at least in part, into Maple Avenue Funding, a PTO checking account controlled by him, but not held in his name.

74.     On or about October 14, 2008, defendant MARIANI filed a false individual income tax return, Form 1040, for calendar year 2007, seeking a refund of

approximately $65,719.

75.     On or about January 20, 2010, defendant MARIANI filed a false individual income tax return, Form 1040, for calendar year 2008, seeking a refund of approximately $26,176.

76.     On or about June 11, 2008, defendant POTOPOWICZ filed a false individual income tax return, Form 1040, for calendar year 2006, seeking a refund of approximately $196,752.

77.     On or about June 25, 2008, defendant POTOPOWICZ filed a false individual income tax return, Form 1040, for calendar year 2007, seeking a refund of approximately $104,388.

78.     On or about November 13, 2008, defendant POTOPOWICZ filed a false amended tax return, Form 1040X, for calendar year 2006, claiming total payments to the IRS of approximately $1.5 million.

79.     On or about November 13, 2008, defendant POTOPOWICZ filed a false amended tax return, Form 1040X, for calendar year 2007, seeking a refund of approximately $1.5 million.

80.     On or about November 3, 2008, defendants MARIANI and POTOPOWICZ aided and assisted in preparing a false individual income tax return, Form 1040, for a MATA customer whose initials are H.O. for calendar year 2007, that claimed a refund of approximately $350,745.

81.     On or about September 23, 2009, defendants MARIANI and POTOPOWICZ aided and assisted in the preparation of a false individual income tax return,

Form 1040, for MATA customer H.O. for calendar year 2008, that claimed a refund of approximately $176,763.

82.     On or about May 13, 2009, defendants CALLE and DONE aided and assisted in the preparation of a false amended tax return, Form 1040X, for a MATA customer for calendar year 2007, that claimed a refund of approximately $202,394.

## D. Personal Use of MATA Funds

83.     From on or about June 25, 2007 through on or about January 11, 2008, defendant OTTAVIANO caused to be transferred approximately $510,618 in profits from the MATA scheme through eight PTO checking accounts, with accounts numbers ending in 6819, 3971, 8418, 8489, 0640, 5655, 8341, and 2492. None of those accounts was held in defendant OTTAVIANO's name. On or about January 11, 2008, those funds were used to purchase defendants OTTAVIANO and FOSTER's personal residence in Lewes, Delaware.

84.     On or about July 28, 2008, defendant OTTAVIANO caused to be transferred approximately $50,045 from the Shore Trust PTO account controlled by him to International Group 8 Fund (HSBC Bank Panama).

85.     On or about September 10, 2008, defendant OTTAVIANO caused to be transferred approximately $75,045 from the Shore Trust PTO account to International Group 8 Fund (HSBC Bank Panama).

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### (Engaging in Monetary Transactions in Property Derived
### from Specified Unlawful Activity – OTTAVIANO and FOSTER)

  1. Paragraphs 1 through 13 and 16 through 85 of Count 1 of this Indictment are realleged as if set forth in full herein.

  2. On or about January 11, 2008, defendants OTTAVIANO and FOSTER purchased a home located at 31183 Conley's Chapel Road, Lewes, Delaware (the "Delaware Home") for approximately $510,618.

  3. The source of the monies used to purchase the Delaware Home was the sale of PTOs and BIC described in Count 1 of this Indictment.  Those illicit proceeds were funneled through several PTO accounts controlled by defendants OTTAVIANO and FOSTER before being transferred to International Group Funding, another PTO checking account controlled by them, which was ultimately used to purchase the Delaware Home.

  4. On or about January 11, 2008, in the District of New Jersey and elsewhere, defendants

RONALD OTTAVIANO and
HARRIET FOSTER

did knowingly engage within the United States in a monetary transaction in and affecting interstate commerce in criminally derived property of a value greater than $10,000, as set forth in paragraphs 2 and 3 above, when that property was in fact derived from specified unlawful activity, namely mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

  In violation of Title 18, United States Code, Section 1957 and Section 2.

-22-

## FORFEITURE ALLEGATION

1.      All paragraphs of Count 2 of this Indictment are realleged as if set forth in full herein for the purpose of noticing forfeitures pursuant to pursuant to Title 18, United States Code, Section 982.

2.      The United States hereby gives notice to defendants OTTAVIANO and FOSTER that upon conviction of the offense charged in Count 2, the Government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a), of all property, real and personal, involved in the offense of conviction in violation of Title 18, United States Code, Section 1957, and all property traceable to such property, including but not limited to the following:

A.      A sum of money equal to at least $510,618 in United States currency, for which defendants OTTAVIANO and FOSTER are jointly and severally liable; and

B.      All right, title, and interest, including all appurtenances and improvements thereon, in the real property known as 31183 Conley's Chapel Road, Lewes, Delaware, in the municipality of Lewes, in the State of Delaware.

3.      If by any act or omission of defendants OTTAVIANO and FOSTER any of the property subject to forfeiture described in paragraph 2 herein:

A.      cannot be located upon the exercise of due diligence;

B.      has been transferred or sold to, or deposited with, a third party;

C.      has been placed beyond the jurisdiction of the court;

D.      has been substantially diminished in value; or

E.      has been commingled with other property which cannot be

subdivided without difficulty,

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1),

to seek forfeiture of any other property of defendants OTTAVIANO and FOSTER up to the

value of the property described above in paragraph 2.

All pursuant to Title 18, United States Code, Section 982.

A TRUE BILL

PAUL J. FISHMAN
United States Attorney

-24-

CASE NUMBER: 10-

**United States District Court**
**District of New Jersey**

**UNITED STATES OF AMERICA**

*v.*

**RONALD OTTAVIANO,**
**MICHAEL BALICE,**
**PAULA MARIANI,**
**PATRICK POTOPOWICZ,**
**HARRIET FOSTER,**
**RICHARD MACFARLANE,**
**WILSON CALLE, and**
**ANGEL DONE**

**INDICTMENT FOR**

18 U.S.C. §§ 371, 982, 1957, and § 2

A True Bill,

**PAUL J. FISHMAN**
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

**Lee Vartan**
*ASSISTANT U.S. ATTORNEY*
*(973) 645-2762*